## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:      **MAGEE BENEVOLENT ASSOCIATION D/B/A MGH**      **CHAPTER 11**
            **Debtor**                                      **CASE NO. 18-03283-KMS**

### APPLICATION TO EMPLOY CHIEF RESTRUCTURING OFFICER, CHIEF FINANCIAL OFFICER AND MANAGEMENT SERVICES PROFESSIONALS

COMES NOW Magee Benevolent Association d/b/a Magee General Hospital (the "Debtor"), and files this its Application to Employ Chief Restructuring Officer, Chief Financial Officer and Management Services Professionals (the "Application"), and in support thereof, would show unto the Court the following, to-wit:

1.      On August 24, 2018, the Debtor herein filed its voluntary original Petition for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). The Debtor remains in possession of its assets and properties as Debtor-in-Possession pursuant to §§1107 (a) and 1108 of the Bankruptcy Code.

2.      To date, no trustee or examiner has been appointed in this case.

3.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A)(M). The venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

4.      This statutory predicate for relief requested herein is 11 U.S.C. § 327 of the Bankruptcy Code.

5.      The Debtor has been engaged in rendering hospital, and related, services for many years. It has enjoyed prosperous times and has made it through meager times. But over the past few years, it unfortunately has had more setbacks and troubles than times of prosperity and has suffered many of the same problems as other rural hospitals throughout the country, in general, and especially problems that community hospitals have suffered, throughout the United States. The Debtor has

been, and continues to be, a significant force in the economy in the Magee, Mississippi, area. Currently, the Debtor employs approximately 105 full-time employees, and provides employment for a number of other persons, in an indirect manner.

6.      The Debtor is responsible for the care of a significant number of hospital patients per month.  Those patients come through the hospital's emergency room, inpatient, outpatient and related support services and they are able to receive a wide array of services through the Debtor.  The Debtor, subsequent to the filing of the Petition in this case, has obtained the use of cash collateral to fund its operations.  Currently, Debtor's authorization to use cash collateral continues through September 8, 2018, and the Court has set a final hearing for use of cash collateral for September 20, 2018.  The Debtor will continue to negotiate with its lender that holds the apparent liens and security interest on its cash collateral for consensual use of cash collateral from September 8 through and including September 20, 2018.

7.      The Court has scheduled a hearing on the Motion to Appoint a Patient Care Ombudsman for August 20, 2018.  The Debtor will suggest that an Ombudsman is unnecessary in this case because patient care at the hospital operated by the Debtor is more than adequate.

8.      Prior to the filing of the Petition herein, the Debtor employed Trilogy Healthcare Solutions, Inc. ("Trilogy") as a financial advisor and management consultant. Trilogy has provided invaluable management and financial advisor services up through the filing of the Petition and continues in that role, subject to the approval of this Application by the Court.  The Court has scheduled a hearing in connection with this application for September 28, 2018.

9.      After having considered its past and current situations, and after having received input, the Debtor has made the decision to employ a chief restructuring officer ("CRO"), as well as a financial advisor and management consultant, and those are the purposes of the Application.  The

Debtor wishes to employ Trilogy as CRO, as well as chief financial officer and financial advisor and management consultant.

10.     The terms and conditions of Trilogy in its role as CRO are set forth in a comprehensive agreement, which is attached hereto as **Exhibit "A"** and incorporated by reference (the "CRO Agreement").  Debtor selected Trilogy based on the fact that it has had considerable experience in the healthcare/restructuring/management field in which it is being employed, as well as the previous experience it has had prior to the filing of the Petition as financial advisors and management consultants of the Debtor.

11.     The Debtor seeks approval of the engagement of Trilogy to serve as the CRO/CFO/financial advisor and management consultant of the Debtor.  The following terms and provisions shall apply to the engagement of Trilogy:

(a)     Officers.  Bill Williams will serve as the CRO of the Debtor and a Trilogy CFO will serve as CFO of the Debtor.

The CRO and the CFO shall exercise operational, management and corporate governance functions previously exercised by the Debtor's Board of Directors (the "Board"), but they shall continue to serve at the pleasure of the Board and with the consent of the Board.  The Board shall retain oversight responsibilities in connection with the operation and management of the Debtor.

(b)     Other Trilogy personnel. Other Trilogy personnel may be used as necessary for the effective rendering of the services contemplated herein.

(c)     Duties.  As CRO, Trilogy shall perform the duties for the Debtor as outlined in the CRO agreement.

(d)     Additional Responsibilities.  Trilogy may provide such additional personnel as

needed to assist in performing the services described herein and such other services as may be needed.

12.     Trilogy's fees for CRO services and for CFO services are as set forth in the CRO agreement. As Trilogy needs additional personnel for the engagement, it may engage additional representatives to be paid according to the CRO agreement.

13.     As noted, Trilogy currently serves as a financial advisor and management consultant to the Debtor. It represents no interest adverse to the Debtor or its estate in matters upon which it is to be engaged, and Trilogy's employment as CRO/financial advisor/CFO/management consultant is in the best interest of the estate. As a matter of disclosure, Trilogy is owed a substantial amount of fees for services rendered prior to the filing of the Petition. Trilogy has agreed to waive, forego and release these fees and expenses that are owed as of the date of the Petition. In addition, two shareholders of Trilogy (including the putative CRO) also own a minority (combined 44%) interest in an entity known as Trilogy Revenue Cycle Solutions, LLC ("Trilogy Revenue") which provides revenue cycle management services to the Debtor pursuant to a separate agreement. It is the Debtor's current plan to ask the Court for authority to assume the Trilogy Revenue agreement (which provides, in its essence, that Trilogy Revenue is responsible for billing and collection functions for and on behalf of the Debtor), at a later date. Debtor asserts that the relationship by, between and among the Debtor, Trilogy and Trilogy Revenue, does not cause Trilogy to be a disinterested professional or disinterested person. Trilogy has no connections with the creditors herein or any other party in interest or their respective attorneys or accountants, or with the office of the U.S. Trustee, any employees thereof, which are prohibited, which would interfere with or hinder the performance of its duties herein, or which need to be described herein, other than as previously

disclosed. As a result, Trilogy is a disinterested person as that term is contemplated within the Bankruptcy Code as represented in the Affidavit attached hereto as **Exhibit "B"**.

14.     Other grounds to be assigned upon a hearing hereof.

THEREFORE, premises considered, Debtor prays that upon a hearing hereof this Honorable Court will enter its order granting the application. Debtor prays for general relief.

This, the 3 rd day of August, 2018.

> Respectfully submitted,
>
> MAGEE BENEVOLENT ASSOCIATION
>
> By Its Attorneys,
>
> LAW OFFICES OF CRAIG M. GENO, PLLC
>
> By: _____
>                Craig M. Geno

OF COUNSEL:

Craig M. Geno; MSB No. 4793
Jarret P. Nichols; MSB No. 99426
LAW OFFICES OF CRAIG M. GENO, PLLC
587 Highland Colony Parkway
P. O. Box 3380
Ridgeland, MS 39158-3380
601-427-0048 - Telephone
601-427-0050 - Facsimile
cmgeno@cmgenolaw.com
jnichols@cmgenolaw.com
N:\Firm Data\Users\Bankrupt\Magee General Hosp\Pleadings\Employ\Chief Restr, CFO & Mgmt Svcs Prof 8-30-18\Application.wpd

## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via Notice of Electronic Filing, a true and correct copy of the above and foregoing instrument to:

**Christopher J. Steiskal**
Office of the United States Trustee
christopher.j.steiskal@usdoj.gov

Jim F. Spencer, Esq.
jspencer@watkineager.com

This, the ___31d___ day of August, 2018.

_____
Craig M. Geno

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:   MAGEE BENEVOLENT ASSOCIATION D/B/A MGH           CHAPTER 11
         Debtor                                        CASE NO. 18-03283-KMS

# EXHIBIT "A"

# BANKRUPTCY RESTRUCTURING AND
# MANAGEMENT SERVICES AGREEMENT

This **BANKRUPTCY RESTRUCTURING AND MANAGEMENT SERVICES AGREEMENT** (the **"Agreement"**) is entered into by and between Magee Benevolent Association, a Mississippi non-profit corporation, tax exempt pursuant to Section 501(c)(3) of the Internal Revenue Code, (collectively referred to as "MGH") and Trilogy Healthcare Solutions, Inc. ("Trilogy"), a Mississippi for profit corporation (MGH and Trilogy are sometimes individually referred to herein as "Party" and collectively referred to as the "Parties") on this the _____ day of_____, 2018 and shall be effective on the date the Agreement is approved by the Bankruptcy Court ("Effective Date").

**RECITALS**

**WHEREAS,** MGH owns and operates a 64-bed licensed hospital facility (44 staffed inpatient beds), clinics and other ancillary businesses, joint venture interests and other related holdings located in Magee, Mississippi, and surrounding communities (the "MGH Operations");

**WHEREAS,** MGH has filed for reorganization under Chapter 11 of the United States Bankruptcy Code and has determined it is necessary and proper to retain the services of Trilogy to manage the MGH Operations and provide a Chief Restructuring Officer ("CRO") and Chief Financial Officer ("CFO") on the terms set forth below;

**WHEREAS,** this Agreement constitutes the entire agreement between Trilogy and MGH with regards to this engagement and supersedes all prior agreements, whether written or oral, between the parties on the subject, including, but not limited to the Management Agreement between MGH and Trilogy dated July 1, 2017, which the parties agree will be terminated upon the execution of this Agreement and approval by the United States Bankruptcy Court in connection with MGH's Chapter 11 bankruptcy filing;

**WHEREAS,** Trilogy has experience in healthcare management as is detailed more particularly on Exhibit A attached hereto;

**WHEREAS,** Trilogy hereby discloses that its shareholders have a forty-four percent (44%) interest in Trilogy Revenue Cycle Solutions, LLC, which provides revenue cycle management services to MGH's hospital facility pursuant to a separate agreement; and

**WHEREAS,** the Board of Directors of MGH has determined that: (i) this Agreement is for a valid public purpose and is in the best interest of MGH and MGH Operations; (ii) this Agreement will enable MGH to accomplish its mission and purpose to provide sustainable healthcare services for the benefit of the communities served by MGH; and (iii) the consideration to Trilogy is reasonable and the services to be received by MGH are full, fair and of substantial value to MGH and MGH Operations.

**NOW, THEREFORE,** in consideration of the promises and the mutual covenants herein contained, the receipt and adequacy of which are for all purposes acknowledged and confessed, it is agreed as follows:

## ARTICLE I.
## ENGAGEMENT OF MANAGEMENT COMPANY

**Section 1.01.  Engagement of Trilogy.**  MGH hereby engages Trilogy, and Trilogy hereby accepts the engagement, to perform the services described in this Article I in accordance with the terms and conditions set forth in this Agreement. This engagement must be approved by the U.S. Bankruptcy Court for the Southern District of Mississippi (the "Bankruptcy Court"), upon separate application, and after notice and a hearing, and upon such approval the terms of this engagement shall be binding between Trilogy and MGH.

**Section 1.02.   Chief Restructuring Officer and Chief Financial Officer Role and Services.** Pursuant to this Agreement, Trilogy will (i) designate William V. Williams III to serve as the Chief Restructuring Officer of MGH and (ii) will provide an employee or contractor to serve as the Chief Financial Officer of MGH. The CRO and the CFO shall be officers of MGH and will perform the duties normally associated with such offices. Upon approval by the Bankruptcy Court, the CRO shall assume responsibility for carrying out the governance functions previously exercised by MGH's Board of Directors (the "Board"); however, the Board will remain in-tact and will serve in an advisory capacity. The CRO will oversee the performance of all services to be provided by Trilogy pursuant to this Agreement. The CRO will oversee and supervise the activities of the CEO of MGH and all other activities of MGH.

**Section 1.03.  Management Services.** Trilogy shall oversee routine, day-to-day operations of MGH and MGH Operations to the extent provided for in this Agreement. MGH acknowledges that while Trilogy will use its reasonable best efforts in performing its obligations under this Agreement, Trilogy does not guarantee any particular results. Trilogy shall act in good faith to manage and operate MGH and MGH Operations consistent with the authority described in this Agreement.  Trilogy's management duties shall include but not be limited to the following:

(a)  perform a review of MGH and MGH Operations including but not limited to a review and assessment of its short and long-term projected cash flows and ability to meet debt service and loan covenant requirements;

(b)  perform a review the existing strategic plans for MGH and MGH Operations and will actively pursue any additional strategies and opportunities that the CRO identifies or deems necessary or advisable under the circumstances;

(c)  will prepare budgets for cash collateral, and other purposes; prepare and review monthly operating reports, financial reports, including schedules of assets and liabilities and statements of financial affairs that may be required for discussions with the Board, lenders and other stakeholders;

(d)   will assist in the identification and implementation of financial, clinical, strategic, and operations improvement opportunities;

(e)   develop and implement restructuring plans and lead a strategic the planning process for maximizing the enterprise value of MGH and MGH Operations;

(f)   will assist with MGH's communications and negotiations with other parties;

(g)   will interface with MGH's employees, contractors, suppliers and creditors, and shall regularly discuss with lenders and other key stakeholders, aspects of MGH's financial and operational matters;

(h)   will oversee and collaborate closely with MGH's Chief Executive Officer to organize, administer, direct and control the restructuring of MGH as may be necessary;

(i)   will assist MGH and its capital providers with reports and cash collateral approval;

(j)   will assist MGH with any other reporting requirements connected with this project and will assist MGH in its dealings with creditors and other stakeholders.

(k)   will manage any sale process approved by the Bankruptcy Court.

**Section 1.04.   Exclusive Broker Services of the Sale MGH's Hospital.**   Should all or any portion of MGH's hospital facility or MGH Operations be sold through any sale process approved by the Bankruptcy Court, Trilogy will act as MGH's exclusive agent and representative in the process. At the appropriate time, and subject to the approval of the Bankruptcy Court, Trilogy will contact potential affiliation partners to determine interest. As circumstances allow, Trilogy will assist MGH in developing and negotiating a transaction with an appropriate, interested health system or healthcare provider that will foster the continued availability of quality, sustainable healthcare services in the community served by MGH. Notwithstanding any other provisions in this Agreement, any sale of all or any portion of MGH's hospital facility will be subject to the approval of the Board.

**Section 1.05.   Other Trilogy Personnel.**   Other Trilogy personnel (employed or contracted) ("Personnel") may be used as necessary for the effective provision of the services by Trilogy as contemplated by this Agreement. Such personnel will be used at Trilogy's sole cost and expense. All such Personnel will report to the CRO.

**Section 1.06.   Additional Responsibilities.**   Upon the written mutual agreement of MGH and Trilogy, Trilogy may provide such additional personnel as MGH may request to assist in performing the services described above and such other services as may be agreed to, on such terms and conditions and for such compensation as MGH and Trilogy will agree.

## ARTICLE II.
## OBLIGATIONS AND LIABILITIES OF TRILOGY

**Section 2.01.  Trilogy Not Liable for MGH's Liabilities.**  At all times during the term of this Agreement, MGH shall remain fully liable and legally accountable to all patients and governmental organizations with respect to medical services rendered to patients.  In addition, during the term of this Agreement, Trilogy shall have no right, authority or duty to act for MGH with respect to any business of MGH and MGH Operations which is not directly related to Trilogy's obligation to provide the management services detailed in Article I of this Agreement and to the extent provided for in this Agreement. The Parties agree that Trilogy shall not, by entering into and performing this Agreement, become liable for any of the existing or future obligations, liabilities or debts of MGH to the extent such arise in the ordinary course of business in operating MGH and MGH Operations and are not the result of any breach by Trilogy of the terms and provisions of this Agreement (collectively, the "Excluded Liabilities"). MGH hereby agrees to indemnify and hold Trilogy harmless from and against any and all Excluded Liabilities, including reasonable attorney's fees and other costs of investigating and defending any such claim or action, asserted against Trilogy on account of any of the Excluded Liabilities.

**Section 2.02.  Trilogy Not Liable for Condition of Premises and Equipment of MGH and MGH Operations.**  Notwithstanding anything contained herein to the contrary, in no event shall Trilogy be liable for any damages arising from, incident to, or in connection with, the condition of the premises and its structure, the equipment, or the environment of MGH and MGH Operations, and any such damages as may arise shall be the responsibility of MGH. In connection with the foregoing, MGH shall comply with any and all applicable fire and safety codes.  This Section shall survive the termination of this Agreement.

**Section 2.03.  Medical, Professional, and Ethical Matters.**  All medical and professional matters shall be the responsibility of MGH and the Medical Staff of MGH's hospital facility and clinics and the Board of MGH. Trilogy, however, may consult with MGH and provide appropriate recommendations concerning such matters. Trilogy shall not be responsible in.any manner for the acts, omissions or conduct of any member of the Medical Staff of MGH's hospital facility or clinics or any other healthcare providers or practitioners.  MGH acknowledges that it fully understands and agrees that Trilogy shall not be liable to any patient, person or third party for damages arising out of or resulting from any medical treatment, or act or omission by, or dishonesty or misconduct of, any servant or employee of MGH, any physician providing professional medical services for MGH, or any agent of MGH, provided that such damages are not attributable to the willful misconduct or gross negligence of Trilogy and/or Trilogy's respective agents, officers or employees.

**Section 2.04.  Trilogy Not Liable for Acts or Omissions of MGH's Agents.**  Trilogy shall not be responsible for the acts or omissions of any of MGH's officers, directors, agents, employees, contractors, subcontractors or any other persons performing any work in connection with MGH and MGH Operations, or any consultants or other persons engaged with respect thereto except when said personnel are engaged by Trilogy and are carrying out specific directions of Trilogy. This Section shall survive the termination of this Agreement.

**Section 2.05.  Trilogy Not Liable for Consultants' Fees and Other Financial Obligations.** MGH, and not Trilogy, shall be responsible for all fees and other compensation charged by consultants and other persons or entities engaged by MGH.

**ARTICLE III.**
**COMPENSATION**

**Section 3.01   CRO Services Fee.**  For designation of the CRO and the performance of the management services as described in Section 1.03 of this Agreement, MGH will pay to Trilogy, in advance, the sum of $30,000 each month. Payment of the CRO Services Fee will be due and payable on the first day of each month.  If this Agreement begins on a day other than the first day of a month, the CRO Services Fee will be prorated accordingly.

**Section 3.02   CFO Services Fee.**  For the services of the CFO, MGH will pay to Trilogy a rate of $200 per hour for the services of the CFO. Within fifteen (15) days after the end of each month, Trilogy will prepare an invoice detailing the number of hours of CFO services provided and will submit such invoice for payment. MGH will pay such invoice within thirty (30) days of the date of the invoice.

**Section 3.03   Affiliation Transaction Fee.**  If during the term of this Agreement, MGH enters into an agreement or series of agreements that result in (i) a change in control, (ii) change of ownership, (iii) sale, lease, transfer or disposal of substantially all of MGH's assets or substantially all of the assets of a business unit of MGH or MGH's Operations, (iv)  merger or consolidation with another healthcare entity, or (v) any similar affiliation or acquisition agreement (collectively "Affiliation Transaction"), MGH shall pay to Trilogy an amount equal to six percent (6%) of the consideration payable pursuant to the Affiliation Transaction.  The Affiliation Transaction Fee will be due upon the closing of the Affiliation Transaction.  Notwithstanding the foregoing, the Transaction Fee will be no less than Seventy-Five Thousand Dollars ($75,000.00).  MGH will require as a condition to the closing of any Affiliation Transaction the payment of the Transaction Fee to Trilogy.  The obligation to pay the Transaction Fee will survive the termination of this Agreement and will be due and owing to Trilogy upon the closing of any Affiliation Transaction, including any Affiliation Transaction occurring within three (3) years following the termination of this Agreement.

**Section 3.04   Expenses.** Trilogy shall be reimbursed for any reasonable expenses incurred by Trilogy in the performance of services under this Agreement. The MGH will reimburse Trilogy for actual out-of-pocket expenses incurred by Trilogy personnel in the performance of services specified in this Agreement, including but not limited to airfare, rental car expense, report preparation, delivery services, printing and any other such costs as deemed necessary to provide these services. The MGH will reimburse Trilogy employees for food and lodging expense incurred while on site at any of MGH's locations or otherwise traveling in connection with the services provided to MGH hereunder (e.g., meeting with lenders, other creditors or vendors). Trilogy will provide MGH with reasonable customary documentation of such out-of-pocket expenses. The MGH is authorized to reimburse Trilogy for such expenses upon presentation of reasonable documentation, but final allowance of the out-of-pocket expenses will be subject to an application for compensation and notice and a hearing. In addition, Trilogy will be compensated for any time

and expenses that Trilogy may incur in considering or responding to discovery requests or other requests for information or while participating in any legal or other proceedings as a result of or in connection with the services provided to MGH under this Agreement. Within fifteen (15) days after the end of each month, Trilogy will prepare an invoice detailing the reimbursable by MGH. MGH will pay such invoice within thirty (30) days of the date of the invoice.

**Section 3.05   Changes**. If any changes to the duties or services outlined above are required, the proposed changes will be discussed with MGH. Fee estimates, if requested, will be provided by Trilogy for the required adjustments before proceeding.

**Section 3.06   Payment Procedures in Bankruptcy: Retainer and Process**. Prior to the commencement of services, MGH will pay Trilogy a retainer of $15,000, which retainer shall be applied to the CRO engagement. Within fifteen (15) days of the close of business on the last day of each month, Trilogy will present MGH with its invoice for services rendered for that month and expenses, and will provide a copy thereof to counsel for Trustmark National Bank, the Office of the United States Trustee, counsel for the Debtor and other interested parties. Creditors and interested parties shall have ten (10) business days to object to any specific line items within the submitted invoices and file those with the Court, copying Trilogy and Debtor's counsel with any objections. The objections must be filed on or before 5:00 p.m. of the tenth business day. Any objection to any specific line item must identify the line item and the amount of time dedicated to the objectionable entry. If there is no objection to any fees and/or any line item expenses in the weekly invoice, that does not waive the right of the United States Trustee or the Committee to object to any fees and/or any line item expenses in the corresponding fee application. MGH is authorized to pay, thereafter, 80% of the invoice submitted with the exception of those line items that have been objected to on a timely basis. Trilogy may file its first application for compensation every sixty (60). Once the engagement is complete, any remaining amount of the retainer (after payment of accrued but unpaid compensation and expenses) will be returned upon the satisfaction of all obligations hereunder.

Payments should be wired to:

|  |  |
|---|---|
| Bank Name: | BankPlus |
| ABA Number: | #065301948 |
| Account Name: | Trilogy Healthcare Solutions, Inc. |
| Account Number: | #4020457596 |

## ARTICLE IV.
## TERM AND TERMINATION

**Section 4.01.   Term.** This Agreement shall commence on the Effective Date and shall continue for an initial term of three (3) years ("Initial Term"). Following the Initial Term, this Agreement shall be automatically renewed under identical terms for additional one (1) year periods thereafter unless Trilogy or MGH provides written notice to the other Party of its intention not to renew this Agreement at least one hundred and twenty (120) days prior to the end of the then-current term.

**Section 4.02.   Termination for Breach.** Either Party (the "Non-Defaulting Party") may terminate this Agreement immediately upon delivery of written notice to the other Party (the "Defaulting Party") in the event that the Defaulting Party is in material breach of this Agreement; provided, however, the Non-Defaulting Party shall first provide a written notice to the Defaulting Party setting forth in reasonable detail the nature of such breach (the "Breach Notice") and affording the Defaulting Party the opportunity to cure such breach within thirty (30) days following the delivery of the Breach Notice. The foregoing cure period shall be extended in the event the Defaulting Party has commenced to cure such default within thirty (30) days following delivery of the Breach Notice and thereafter continues diligently to cure such default to the reasonable satisfaction of the Non-Defaulting Party, so long as the extension of the cure period does not adversely affect the continued operation of any of MGH or MGH Operations.

**Section 4.03.   Other Termination For Cause.**   Either Party may terminate this Agreement immediately upon notice to the other Party upon the occurrence of any of the following situations: (i) either Party reasonably determines that patient health or safety is in imminent and serious danger from the other Party's actions; (ii) MGH's license to operate MGH and MGH Operations or its Medicare certification is revoked; (iii) a change in any statute, regulation, rule or other law that causes any material term, provision or undertaking contemplated by this Agreement to be illegal, invalid or unenforceable; (iv) the filing by either Party of a voluntary petition for bankruptcy, reorganization, receivership or protection from creditors generally, or an involuntary filing that is not resolved by dismissal after ninety (90) days from the filing date. Any notice of termination given under this Section 4.03, shall state the cause of termination and shall be effective upon delivery consistent with the Notice provisions set forth in Section 5.08 unless a later effective date is set forth in the notice.

**Section 4.04.   Termination by Trilogy.** During the Initial Term of this Agreement and during any renewal term, Trilogy may terminate this Agreement upon thirty (30) days' written notice to MGH in its discretion upon the failure of MGH to timely pay all fees or expenses.

**Section 4.05.   Termination by Either Party.** After the third year of this Agreement, either Party may terminate this Agreement with or without cause by giving sixty (60) days' prior written notification of its intent to terminate this Agreement.

**Section 4.06.   Management Fees Upon Termination.** In the event of termination of this Agreement for any reason, such termination shall not affect or negate the obligation of MGH to pay any compensation owed to Trilogy under Article IV of this Agreement which accrued prior to the effective date of the termination.

**Section 4.07.   Force Majeure.**   Neither Party shall be liable nor deemed to be at fault or in breach of this Agreement as a result of, directly or indirectly, acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, strikes or other work interruptions by either Party's employees, or any similar or dissimilar cause beyond the reasonable control of either Party.

## ARTICLE V.
## GENERAL PROVISIONS

**Section 5.01.   Insurance.** Trilogy shall have the sole responsibility for obtaining and maintaining, at its own cost, during the term of this Agreement, adequate and reasonable liability insurance with such coverage and limits as deemed acceptable by MGH in its reasonable discretion covering its acts as manager.

**Section 5.02.   Employees.**   Each Party shall be responsible for the hiring and firing of their respective employees or their agents.   Trilogy may reasonably request that MGH remove an MGH employee or agent from MGH and MGH Operations, and MGH shall act on such request within thirty (30) days of receipt.   Except as specifically stated in this Section 5.02, nothing in this Agreement shall be deemed to require either Party to make any personnel decisions based on a request made under this Section.

**Section 5.03.   Mutual Indemnification.**   A Party ("Defaulting Party") shall indemnify and hold harmless the other Party ("Non-Defaulting Party") and its officers, directors, employees, agents, and affiliates from and against any damages, claims, costs, liabilities, expenses or obligations (including, without limitation, reasonable attorney's fees and associated expenses) incurred or suffered by any of them as a result of or arising from: (i) a material breach of the terms, provisions, representations, warranties, and/or covenants required of the Defaulting Party under this Agreement, (ii) any loss or damage to property or death of or injury to any person solely caused by or resulting from the negligent acts or omissions of the Defaulting Party or the Defaulting Party's employees, independent contractors, representatives, affiliates or agents, and (iii) any violation of any law or permit, license, consent or approval by the Defaulting Party.

**Section 5.04.   Independent Relationship.**   The Parties hereto acknowledge and agree that the relationship created between Trilogy and MGH is strictly that of an independent contractor with respect to the services described in this Agreement.   Nothing contained herein shall be construed as creating any other type of relationship between the Parties and their respective employees other than one of independent contractor.   Nothing contained in this Agreement shall be construed to permit Trilogy to engage in the practice of medicine, it being the intention of the Parties hereto that the services to be rendered to MGH by Trilogy are solely for the purpose of providing the Services.   It is further the intention of the Parties that all decisions and actions constituting or impinging upon treatment or diagnosis of patients are to be the exclusive province of MGH's physicians or other licensed persons, and the provisions of this Agreement shall be construed accordingly.

**Section 5.05.   Section Headings.**   The section headings set forth herein are for purposes of convenience only and shall have no bearing whatsoever on the actual content of this Agreement.

**Section 5.06.   Notices.**   Any and all notices, requests or other communications hereunder shall be given in writing and delivered by: (i) regular, overnight or registered or certified mail (return receipt requested), with first class postage prepaid; (ii) hand delivery; (iii) email; or (iv) overnight courier service, to the Parties at the following addresses or facsimile numbers:

If to Trilogy:
Trilogy Healthcare Solutions, Inc.
404 Legacy Park, Suite A
Ridgeland, MS  39157
Email: bill@trilogy-health.com
Facsimile: 769.524.4668
Attn:  William V. Williams III

If to MGH:
Magee General Hospital
300 Third Avenue Southeast
Magee, MS  39111
Attn:  Chairman of the Board of Directors

With copy to the CEO:
300 Third Avenue Southeast
Magee, MS  39111

or at such other address or number as shall be designated by either of the Parties in a notice to the other Party given in accordance with this Section. Except as otherwise provided in this Agreement, all such communications shall be deemed to have been duly given: (i) in the case of a notice sent by regular mail, on the date actually received by the addressee; (ii) in the case of a notice sent by registered or certified mail, on the date receipted for (or refused) on the return receipt; (iii) in the case of a notice delivered by hand, when personally delivered; (iv) in the case of a notice sent by facsimile, upon transmission subject to telephone confirmation of receipt; and (v) in the case of a notice sent by overnight mail or overnight courier service, the date delivered at the designated address, in each case given or addressed as aforesaid.

**Section 5.07.   Non-Waiver.**  No waiver by either of the Parties hereto of any failure by the other Party to keep or perform any provision, covenant, or condition of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other provision, covenant or condition. All rights and remedies herein granted or referred to are cumulative; resort to one shall not preclude resort to another of any other right or remedy provided by law.

**Section 5.08.   Corporate Authority.**  Trilogy and MGH each warrant that the execution of this Agreement has been duly authorized and that the representative executing this Agreement on its behalf is duly authorized to do so. Additionally, MGH's board shall spread this Agreement on its minutes.

**Section 5.09.   Assignment.**  The rights and obligations of this Agreement may not be assigned or delegated by either Party without the prior written consent of the other Party.

**Section 5.10.   Amendment; Counterparts.**  In order to be effective, any amendments to this Agreement must be in writing and signed by both Parties. This Agreement may be executed in any number of counterparts, each of which shall be an original and all of such counterparts shall all together constitute one and the same Agreement.

**Section 5.11.  Entire Agreement.** This Agreement supersedes any previous contracts, agreements or understandings between the Parties and constitutes the entire agreement between the Parties. The Parties acknowledge that any statements or documents not specifically referenced and made a part of this Agreement shall not have any effectiveness.

**Section 5.12.  Access to Records.** Trilogy shall, in accordance with applicable federal law and until the expiration of four (4) years after the termination of this Agreement, make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of this Agreement and such books, documents, and records as are necessary to verify the nature and extent of the costs of the services provided by Trilogy under this Agreement. Trilogy further agrees that in the event Trilogy carries out any duties under this Agreement through a subcontract with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, such agreement shall contain a clause to the effect that until expiration of four (4) years after the furnishing of such services pursuant to such subcontract, the related organization shall make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of such contract and such books, documents, and records of such organizations as are necessary to verify the nature and extent of such costs. This Section is included pursuant to and is governed by the requirements of federal law. No attorney-MGH, accountant-MGH, or other legal privilege will deem to have been waived by the Parties or any of the Parties' representatives by virtue of this Agreement.

**Section 5.13.  Governing Law.** This Agreement (i) shall be governed and construed in accordance with the laws of the State of Mississippi, regardless of the laws that might otherwise govern under applicable principles of conflict of laws thereof; (ii) incorporates the entire understanding of the parties with respect to the subject matter hereof; and (iii) may not be amended or modified except in writing executed by all parties hereto. Each of the parties hereto (including Trilogy) agrees (iv) to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the engagement or the performance or non-performance of Trilogy hereunder; (v) that, to the extent permitted by applicable law, any federal court sitting within the Southern District of Mississippi shall have exclusive jurisdiction over any litigation arising out of this Agreement, subject to any jurisdiction retained by the Bankruptcy Court as reflected in any order of the Bankruptcy Court; (vi) to submit to the personal jurisdiction of such courts; and (vii) waives any and all personal rights under the law of any jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to jurisdiction or venue within the Southern District of Mississippi for any litigation arising in connection with this Agreement.  If any provision of such terms of the Agreement is unenforceable, such provision shall not affect the other provisions, but such unenforceable provision will be modified to the extent needed to render it enforceable, preserving the intent of the parties to this Agreement. This Agreement shall be enforced in accordance with the laws of the State of Mississippi without giving effect to any choice or conflict of law provision that would cause the application of the laws of any jurisdiction other than the State of Mississippi. Each of the parties irrevocably agrees that any legal action or proceeding with respect to this Agreement shall be brought and determined exclusively in the state or federal court having jurisdiction over Simpson County, Mississippi.

**Section 5.14.  Name and Trademark.**  The Parties agree that Trilogy may use MGH's name and/or logo in advertisements that list MGH as a client of Trilogy.  Other than the use set forth in the preceding sentence, neither Party will use the other Party's name, symbol, or trademark in any marketing, advertising or any other public communications without the prior written consent of such Party regarding the use of its name, symbol, or trademark.

**Section 5.15.  Licensing and Accreditation.**  The Parties recognize that MGH has the sole and ultimate responsibility to keep and maintain all of its operating licenses under the laws of the State of Mississippi. Each Party covenants and agrees to cooperate in any filing with any regulatory agency as may be required by law and obtaining any necessary licenses, approvals and authorizations therefrom. Each Party further covenants that it will do nothing willful to jeopardize Medicare, Medicaid and other third-party reimbursement agreements of MGH. The Parties agree to abide by all laws, ordinances, rules and regulations of local, state or federal governments pertaining to the operation of MGH and MGH Operations.

**Section 5.16.  Confidentiality of Records.**

    (a)   Confidential Information of MGH.  Trilogy recognizes that due to the nature of this Agreement, Trilogy has had and will continue to have access to and will be engaged in researching, obtaining, gathering, compiling, analyzing and/or utilizing information of a proprietary nature owned by MGH, including: (i) financial information, strategic plans, marketing techniques, computer programs, operating manuals, policies and procedures, methods of doing business, personnel files, and similar information utilized and/or developed by MGH in connection with its operation and/or ownership of MGH and MGH Operations (the "Business Information"), and (ii) certain information regarding the medical services rendered to patients of MGH (the "Patient Information"), including information that will be subject to protection under HIPAA, Public Law 104-191 and the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act"). Trilogy hereby acknowledges and agrees that all of the Business Information and Patient Information, whether existing as of the date of this Agreement or subsequently generated by MGH or Trilogy in the course of performing the services contemplated hereunder (collectively, the "Confidential Information"), is the exclusive, proprietary property of MGH and is being disclosed solely for the purpose of enabling Trilogy to provide the services contemplated hereunder. Upon the execution of this Agreement, the parties will execute a Business Associate Agreement in the form attached as Exhibit B.

    (b)   Nondisclosure.  During the term of this Agreement and for two (2) years thereafter, Trilogy: (i) shall maintain all Confidential Information, whether embodied in written, oral or electronic form, in strict confidence; (ii) shall not publish, share, discuss, disclose or otherwise communicate the Confidential Information to any person or entity that is not a party to this Agreement; and (iii) shall not use the Confidential Information for any purpose other than in performing the services contemplated under this Agreement.  Notwithstanding the foregoing, Trilogy may disclose the Confidential Information to its directors, officers, employees, independent

contractors and other affiliates (collectively, the "Representatives"), but only if such Representatives reasonably need to know the Confidential Information in connection with the performance of the management services contemplated hereunder. Trilogy, prior to the disclosure of any Confidential Information to its Representatives, will: (i) use reasonable efforts to maintain the confidentiality of the Confidential Information; (ii) inform each of its Representatives of the confidential nature of the Confidential Information and of this Agreement; (iii) direct its Representatives to treat the Confidential Information confidentially and not to use it other than in connection with the performance of the services contemplated under this Agreement; (iv) be satisfied that such Representatives will act in accordance herewith; and (v) have such Representative agree to be bound by this Agreement. Trilogy shall be responsible for any improper use of the Confidential Information or breach of this Agreement by the Representatives (including, without limitation, its Representatives who, subsequent to the first date of disclosure of Confidential Information hereunder, become its former Representatives).

(c)   <u>Standard of Care</u>. Trilogy shall provide the same standard of care to avoid disclosure or unauthorized use of the Confidential Information as it provides to protect its own proprietary information which it desires to maintain in strict confidence; provided, however, that Trilogy shall in no event use less than a reasonable standard of care in performance of its obligations hereunder. Trilogy shall establish appropriate barriers to entry, access, or reproduction (both electronic and physical access) of the Confidential Information.

(d)   <u>Return/Destruction</u>. Within thirty (30) days of its receipt of a written request from MGH and within a reasonable period of time following the expiration or termination of this Agreement, Trilogy shall, unless otherwise required under statutory or regulatory document retention requirements, promptly destroy (and deliver to MGH written confirmation satisfactory to MGH of the destruction) or return to MGH, or in the case of electronic, magnetic or digital media, erase or render unreadable, all materials furnished to or obtained by MGH which contain Confidential Information. The destruction or return of the Confidential Information shall not relieve Trilogy of its confidentiality or other obligations hereunder.

(e)   <u>Remedies</u>. Notwithstanding any other provision within this Agreement to the contrary, the Parties understand and agree that Trilogy's obligations and covenants pursuant to this Section 5.16 shall extend indefinitely beyond the term and shall survive termination or expiration of this Agreement. Trilogy shall promptly notify MGH in the event Trilogy shall have knowledge of any breach of the confidentiality of, or the misappropriation of, any Confidential Information. Furthermore, the Parties acknowledge and agree that money damages alone would not be a sufficient remedy in the event of any breach of the confidentiality of, or the misappropriation of, any Confidential Information, and that in addition to all other remedies, MGH shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach. Trilogy hereby waives the securing or posting of any bond in connection with any such remedy.

(f)    <u>Confidential Information of Trilogy</u>. During the term of this Agreement and for two (2) years thereafter, MGH: (i) shall keep confidential the terms of this Agreement, and (ii) shall not publish, share, discuss, disclose or otherwise communicate the terms of this Agreement to any person or entity that is not a party to this Agreement without the express written permission of Trilogy Notwithstanding the foregoing, MGH may disclose the terms of this Agreement to its directors, officers, employees, independent contractors and other affiliates (collectively, the "Representatives"), but only if such Representatives reasonably need to know such information the Confidential Information in connection with the performance of their functions on behalf of MGH.

**Section 5.17.   <u>Non- Solicitation</u>.** For a period of two (2) years following the termination or expiration of this Agreement ("Restricted Period"), neither Party will, directly or indirectly, solicit or otherwise communicate with any of the employees, of the other or any of such Party's affiliates or subsidiaries with the purpose of causing such person or entity to terminate their employment with the other Party.  In addition, the Parties agree that during the Restricted Period, they shall not employ or otherwise hire any of the employees of the other Party without such Party's express written consent.

**Section 5.18.   <u>Limitation on Liability</u>.** In no event shall Trilogy be liable to the MGH, whether a claim be in tort, contract or otherwise, for any amount in excess of the total professional fees paid pursuant to this Agreement, or for any consequential, indirect, special or punitive damages, including loss of profit, data, business or goodwill or similar damages relating to Trilogy's services provided under this Agreement, except to the extent finally determined to have resulted from the willful misconduct or fraudulent behavior of Trilogy relating to such services or from a breach of the warranty of good faith and professionalism set forth below. The MGH will not indemnify Trilogy in connection with claims for willful misconduct or fraudulent behavior of Trilogy relating to such services. MGH accepts and acknowledges that Trilogy has not made any warranties or guarantees of any nature with respect to the results, outcome or final developments in this matter or with respect to the economic, financial or other results which the MGH may experience as a result of the services provided by Trilogy. In no event shall Trilogy, its subcontractors or their respective personnel, including the CRO and the CFO be liable for any loss of use, data, goodwill, revenues or profits or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement. No action in connection with this engagement may be brought by either party more than one (1) year after the cause of action has accrued, except that an action for non-payment may be brought by a party no later than one (1) year after the date of the last payment due to the party bringing the action. Trilogy warrants that it shall perform the services in good faith and in a professional manner. Trilogy disclaims all other warranties, either express or implied. In no event shall Trilogy be indemnified or receive contribution to the extent that any claim or expense has resulted from Trilogy's bad faith, self-dealing, breach of fiduciary duty, gross negligence, willful misconduct or fraudulent conduct. The parties acknowledge that Trilogy does not assume other than as required by applicable law, and expressly disclaims to the extent permitted by applicable law, any fiduciary duties as financial advisor, and does not by this reference assume any fiduciary duties not imposed by applicable law. If and when Trilogy is engaged as CRO, Trilogy shall expressly assume such fiduciary duties as may be inherent in that role under applicable law or imposed by order of the Bankruptcy Court.

**Section 5.19.   No Third-Party Beneficiaries.**   The rights, privileges, benefits and obligations arising under or created by this Agreement are intended to apply to and shall only apply to the Parties and to no other persons or entities.

**Section 5.20.   Conflicts.**   Trilogy is not currently aware of any relationship that would create a conflict of interest with MGH or those parties-in-interest of which MGH has made Trilogy aware. Because Trilogy is a professional services firm that serves clients throughout Mississippi, it is possible that Trilogy may have rendered services to or have business associations with other entities or people which had have or may have relationships with MGH, including creditors of MGH. Should Trilogy become or be made aware of a potential conflict, Trilogy will decide on the most appropriate action to be taken and will work to resolve the potential conflict.

**Trilogy hereby discloses that its shareholders have a forty-four percent (44%) interest in Trilogy Revenue Cycle Solutions, LLC, which provides revenue cycle management services to MGH's hospital facility pursuant to a separate agreement.  In addition, Trilogy is owed for pre-bankruptcy services; however, if the Bankruptcy Court approves the engagement described in this Agreement, Trilogy will waive all pre-bankruptcy fees and expenses.**

**Section 5.21.   Approval by a Bankruptcy Court.**   MGH, having filed for Chapter 11 reorganization, shall promptly petition the Bankruptcy Court to approve Trilogy's retention under this Agreement. In conjunction therewith, MGH agrees that Trilogy is a "Disinterested Person" as defined in section 101(14) of the U.S. Bankruptcy Code. The petition submitted to the court must be satisfactory to Trilogy.  In addition to Trilogy's other rights or remedies, Trilogy may, without any liability arising, terminate this engagement if a final order authorizing Trilogy's employment is not issued by the Bankruptcy Court on or before sixty (60) days from the commencement of any bankruptcy on terms satisfactory to Trilogy or if the application is denied by the Bankruptcy Court. In such a case, MGH agrees to withdraw or change, upon Trilogy's request, the application filed with the Bankruptcy Court.

**Section 5.22.   No Audit; No Duty to Update.**   It is understood that Trilogy is not being requested and does not undertake to perform an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of the AICPA, SEC or other state or national professional or regulatory body. Trilogy and all Trilogy personnel are entitled to rely on the accuracy and validity of the data disclosed to them or supplied to them by employees and representatives of MGH. Trilogy is under no obligation to update data submitted to Trilogy or any analyses derived therefrom except as specifically agreed by Trilogy and MGH.

**Section 5.23.   No Third Party Beneficiary.**   MGH acknowledges that all advice (written or oral) given by Trilogy in connection with this engagement is intended solely for the benefit and use of MGH in considering the matters to which this engagement relates. MGH agrees that no such advice shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time in any manner without Trilogy's prior approval (which shall not be unreasonably withheld), except as required by law. Unless required by law, MGH shall not provide any advice given or report issued by Trilogy to any third party or refer to Trilogy or the services we have performed without Trilogy's prior written consent. In no event, regardless of whether consent has been provided, shall

14

Trilogy assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

**Section 5.24.  Enforceability; Severability.**  The invalidity or unenforceability of any term or provision of this Agreement shall not, unless specified, affect the validity or enforceability of any other term or provision, which shall remain in full force and effect.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed in multiple originals by their duly authorized officers, all as of the day and year first written above.

**TRILOGY HEALTHCARE SOLUTIONS, INC.**


By: _____
    William V. Williams III


**MAGEE BENEVOLENT ASSOCIATION**


By: _____

Name: _____

Title: _____

# EXHIBIT A

# TRILOGY HEALTHCARE SOLUTIONS INFORMATION



# About Trilogy Healthcare Solutions

Trilogy was created with the future of healthcare in mind. Founded by a small group of former hospital and health system CEOs, CFOs and Physician Practice Executives with more than 75 years combined experience, the Trilogy team is committed to the belief that local healthcare is the best healthcare.

Uniquely qualified to bring the best of the corporate healthcare world to your community health organization, Trilogy offers expertise in operational, quality and financial controls, broad-scale efficiencies and proven best practices. Current and future challenges within the healthcare industry and shifting reimbursement models demand innovative methods to ensure financial sustainability while maintaining a focus on delivering quality patient care in an environment that promotes high levels of employee, patient and physician satisfaction.

**Our Services Include:**

➢ Interim management services for hospitals and physician practices.
➢ Long-term management services for hospitals and physician practices.
➢ Transitional management services that include: change of ownership or control, oversight and coordination, preparation for and navigation through acquisition or affiliation negotiations and execution.
➢ Consulting and management services for hospitals and physician practices that include all aspects of day-to-day management and optimization of outcomes.

Trilogy identifies and executes positive solutions for community-based healthcare organizations. Our mission is to provide our clients the tools and resources required to deliver the absolute best in clinical care, customer service and community responsibility while reaching maximum, sustainable financial goals.





# Mission

To provide our clients the tools and resources required to deliver the absolute best in clinical care, customer service and community responsibility while reaching maximum, sustainable financial goals.

# Vision

To lead the industry in consulting and management services for community-based healthcare providers, attracting and retaining the best and brightest professionals while creating a culture of excellence and responsibility.

# Values

Our principle values of People, Product and Service demand that our team foster relationships and communication that are respectful, honest and open to create an atmosphere of stewardship and innovation which leads to excellence in healthcare.

trilogy-health.com // 601.427.5988



# How Trilogy Healthcare Solutions Can Help You

Our team of seasoned executives and associates can provide the following partnership models and services to help your organization achieve your specific short- and long-term objectives. Our principal partners have over 75 years of healthcare leadership experience in a variety of healthcare entities and markets across the country, as well as a vast network of talented and experienced associates that can collectively address virtually any issue or challenge a healthcare provider or facility may encounter.

**Examples Include:**

- Budgeting
- Capital Expenditure Planning and Assessment
- Case Management
- Cash Flow Management
- Clinical Outcomes
- Compliance
- Construction Planning
- Emergency Services
- Employee Benefits
- Executive Management
- Executive Recruitment
- Health Information Services
- HIPAA
- Human Resources
- Legal
- Lobbying

- Malpractice and Liability Insurance
- Managed Care Contracting
- Management Information Services
- Media Relations
- Merger & Acquisition Strategic Planning
- Operational Finance
- Physician Employment
- Physician Practice Management
- Physician Recruitment
- Quality Outcomes and Metrics
- Reimbursement
- Revenue Cycle
- Risk Management
- Staffing
- Strategic Planning
- Supply Purchasing



# Revenue Cycle

The Revenue Cycle process is multi-disciplinary and substantially impacts every aspect of healthcare operations and finance. In today's rapidly changing healthcare environment, combined with increased reimbursement pressures, it is more critical than ever to ensure maximum performance in every aspect of the revenue cycle. Our team of experienced revenue cycle professionals can help improve and optimize every aspect of the revenue cycle, from scheduling and registration, to final claims resolution. The scope of our revenue cycle engagements is tailored to fit the needs and maximize opportunities for each client.

**Our Services Include:**

- Scheduling
- Pre-certification
- 3rd Party Eligibility
- Insurance Verification
- Medical Necessity
- Patient Portion Estimator
- Charity
- Point of Service Collections
- Registration
- Charge Processes
- Case Management/Concurrent Review
- Coding and Documentation
- Management of Discharged-Not Final Billed Accounts
- Collections Follow-Up
- Collections Cycle – Early Out, Primary and Secondary Placements

- Electronic Payment Posting
- Cash Handling
- Contract Management
- Payment Discrepancies
- Denials Management
- RAC Audit Management
- Key Controls Assessments
- Cash Accelerations
- Pricing
- Coding Audits and Charge Master
- Strategic Planning
- Managed Care Evaluation
- Supply Chain Assessment
- Software Evaluation/Management
- GPO Access



# Our Business Models Include:



trilogy-health.com // 601.427.5988

## EXHIBIT B
## BUSINESS ASSOCIATE AGREEMENT

This **BUSINESS ASSOCIATE AGREEMENT** (the "Agreement") is entered into on this the _____ day of _____, 2018, between MAGEE BENEVOLENT ASSOCIATION and all affiliated entities ("Covered Entity") and Trilogy HEALTHCARE SOLUTIONS, INC. ("Business Associate").  The parties are entering into this Agreement in order to comply with the national standards for the privacy and security of individually identifiable protected health information of the Covered Entity's patients adopted by the Department of Health and Human Services ("DHHS") as required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act"), and the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164 (collectively, the "HIPAA Privacy and Security Standards").

The parties agree as follows:

1.   **Definition of Protected Health Information, Use and Disclosure.**

The following definitions apply to this Agreement:

a.   "Protected Health Information" means any individually identifiable health information in any form and includes but is not limited to genetic information as required by the Genetic Information Nondiscrimination Act of 2008.

b.   "Use" means, with respect to protected health information, the sharing, employment, application, utilization, examination or analysis of such information within the entity that maintains the information.

c.   "Disclosure" means, with respect to protected health information, the release, transfer, provision of access to, or divulging in any other manner such information outside the entity that maintains the information.

All other terms shall be defined in a manner that is consistent with the HIPAA Privacy and Security Standards.

2.   **Underlying Business Relationship.** Covered Entity has engaged Business Associate to provide hospital management services for the Covered Entity pursuant to a Management Services Agreement of even date herewith ("Management Services Agreement").

3.   **Permitted Uses and Disclosures by Business Associate.**  Business Associate may only use or disclose protected health information for the following purposes and subject to the conditions described in Section 4 of this Agreement:

B-1

a.   Business Associate may only use or disclose protected health information as necessary to perform the services described in Section 2 of this Agreement or as otherwise provided for below;

b.   Business Associate may use or disclose protected health information as required by law.

c.   Business Associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by Covered Entity, except for the specific uses and disclosures set forth below:

(i)   Business Associate may use protected health information for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate;

(ii)   Business Associate may disclose protected health information for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate, provided the disclosures are required by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

(iii)   Business Associate may provide data aggregation services relating the healthcare operations of Covered Entity.

4.   **Duties of Business Associate.**   Business Associate shall comply with the HIPAA Privacy and Security Standards applicable to Business Associate when using or disclosing protected health information that it receives from Covered Entity or from another person or entity on behalf of the Covered Entity.   Specifically, Business Associate agrees to the following:

a.   Business Associate will not use or disclose protected health information other than as permitted or required by this Agreement or as required by law.

b.   Business Associate will use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by this Agreement.

c.   Business Associate will report to Covered Entity within five (5) business days any use or disclosure of protected health information not provided for by this Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security

B-2

incident of which it becomes aware. Business Associate shall comply with the HIPAA Privacy and Security Standards concerning notification in the event of a breach of protected health information, as such requirements apply to Business Associate.

d.   In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, Business Associate will ensure that any subcontractors or agents that create, receive, maintain or transmit protected health information on behalf of Business Associate agree to the same restrictions, conditions, and requirements that apply to Business Associate with respect to such information. Business Associate shall identify such subcontractors or agents to the Covered Entity.

e.   Business Associate will make available protected health information in a designated record set to Covered Entity, or to an individual or the individual's designee, as applicable, as necessary to satisfy Covered Entity's obligations under 45 CFR 164.524.

f.   Business Associate will make its internal practices, books and records available to the Secretary of the Department of Health and Human Services for purposes of determining compliance with the HIPAA Privacy and Security Standards.

g.   Business Associate will make any amendment(s) to protected health information in a designated record set as directed or agreed to by Covered Entity pursuant to 45 CFR 164.526, or take any other measures as necessary to satisfy Covered Entity's obligations under 45 CFR 164.526.

h.   Business Associate will maintain and make available the information required to provide an accounting of disclosures to Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.528. If Covered Entity requests, Business Associate will provide to Covered Entity or to an individual an accounting of all Business Associate's disclosures of protected health information except for disclosures exempted from this requirement in 45 C.F.R. 164.528, as amended by the HITECH Act.

Every accounting shall provide:

(i)   The date of each disclosure;

(ii)   The name and address of the organization or person who received the protected health information;

(iii)   A brief description of the information disclosed; and

(iv)   For disclosures other than those made at the request of the individual, the purpose for which the information was disclosed or a copy of the request or authorization for disclosure.

Business Associate will provide the accounting to Covered Entity as soon as possible, but at least within thirty (30) days from Covered Entity's request. Business Associate shall maintain a process to provide this accounting of disclosures for as long as Business Associate maintains protected health information received from or on behalf of Covered Entity.

i.   Business Associate shall comply with the privacy requirements of the HITECH Act and any implementing regulations, when effective, to the extent that such requirements apply to business associates.

j.   To the extent Business Associate is to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 CFR Part 164, Business Associate will comply with the requirements of Subpart E that apply to the Covered Entity in the performance of such obligation(s).

k.   Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

   **5.   Business Associate's Responsibility for Actions.**   Business Associate shall be responsible for the actions of its employees, agents, owners and managers in connection with its engagement by Covered Entity including without limitation the services listed in Section 2 of this Agreement.

   **6.   Indemnification.**   Business Associate will defend and indemnify Covered Entity from and against any and all claims, damages, liabilities, losses and expenses (including reasonable attorney's fees) based on or arising out of the alleged or actual improper use or disclosure of protected health information by Business Associate or its employees, agents or subcontractors. In order for Covered Entity to be indemnified, Covered Entity shall give notice to Business Associate of any claims, damages, liabilities, losses and expenses (including reasonable attorney's fees) based on or arising out of the alleged or actual improper use or disclosure of protected health information by Business Associate or its employees, agents or subcontractors within ten (10) after becoming aware of such claims, damages, liabilities, losses and expenses (including reasonable attorney's fees) based on or arising out of the alleged or actual improper use or disclosure of protected health information by Business Associate or its employees, agents or subcontractors. At Business Associates' option, Business Associate may elect to control the defense of any claim or action for which Covered Entity seeks indemnification and may select and engage the attorneys defending such claim or action. If Covered Entity requires, Business Associate shall obtain and maintain insurance coverage (if available) against improper uses and disclosures of protected health information by Business Associate, naming Covered Entity as an additional insured. Promptly following Covered Entity's written request, Business Associate shall deliver to Covered Entity a certificate evidencing Business Associate's maintenance of such insurance.

   **7.   Remedies upon Breach or Covered Entity's Suspicion of Breach.**   In addition to Business Associate's fulfilling its obligations as set forth in the HIPAA Privacy and Security

Standards, upon a breach or a suspected breach by Business Associate of any requirement of this Agreement, Covered Entity, at its option, may require Business Associate to:

    a.    Furnish to Covered Entity copies of its practices and procedures and books and records to facilitate Covered Entity's mitigation of damages arising from an improper use, disclosure or breach of privacy or security by Business Associate;

    b.    Exercise all reasonable efforts to retrieve improperly used or disclosed protected health information and to mitigate damages to Covered Entity and/or any individual(s) arising from any privacy or security breach of Business Associate or its employees, agents or subcontractors, including but not limited to gathering information necessary for and bearing the cost of notifying such individual(s) of such breach;

    c.    Establish and adopt new practices, policies and procedures to assure that protected health information is not used or disclosed in the future in violation of the HIPAA Privacy and Security Standards;

    d.    Comply with all auditing or reporting requests by Covered Entity to demonstrate Business Associate's compliance with the HIPAA Privacy and Security Standards; and

    e.    Take such other actions as Covered Entity may reasonably require.

8.    **Term and Termination.**

    a.    This Agreement shall be effective as of the date written above, and shall remain in effect for the entire length of the underlying business relationship described in Section 2 above, or until this Agreement is terminated as provided below, whichever occurs sooner.

    b.    Covered Entity may terminate this Agreement and the underlying business relationship between the parties pursuant to Section 4.02 of the underlying Management Services Agreement between the parties, if Covered Entity, reasonably, determines that Business Associate has violated a material term of this Agreement.

    c.    Except as provided for in Section 8.d below, upon termination of this Agreement for any reason, Business Associate shall return to Covered Entity, or if agreed to by Covered Entity, destroy all protected health information received from Covered Entity, or created, maintained, or received by Business Associate or any subcontractor on behalf of Covered Entity.   Business Associate shall retain no copies of such information.

    d.    If the return or destruction of protected health information is not feasible, Business Associate, with respect to protected health information received from

Covered Entity, or created, maintained or received by Business Associate or any subcontractor on behalf of Covered Entity, shall:

(i)   Retain only that protected health information which is necessary for Business Associate to continue its proper management and administration or to carry out its legal responsibilities;

(ii)  Return to Covered Entity, or if agreed to by Covered Entity, destroy the remaining protected health information that Business Associate still maintains in any form;

(iii) Continue to use appropriate safeguards and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information to prevent use or disclosure of the protected health information, other than as provided for in this section, for as long as Business Associate retains the protected health information;

(iv)  Not use or disclose the protected health information retained by Business Associate other than for the purposes for which such protected health information was retained and subject to the same conditions set forth in Section 4 of this Agreement which applied prior to termination; and

(v)   Return to Covered Entity, or if agreed to by Covered Entity, destroy the protected health information retained by Business Associate when it is no longer needed by Business Associate for its proper management and administration or to carry out its legal responsibilities.

9.   **Change of Law; Applicable Law.**  If any state or federal laws or regulations, now existing or enacted or promulgated after the effective date of this Agreement, are interpreted by judicial decision, a regulatory agency or legal counsel to a party to indicate that any provision of this Agreement may be in violation of such laws or regulations, the parties shall amend this Agreement as necessary. The parties will act in good faith in attempting to preserve the underlying rights, duties and obligations established in this Agreement. This Agreement and its validity, construction and performance shall be governed in all respects by the laws of the State of Mississippi and by the HIPAA Privacy and Security Standards.

10.  **General Provisions.**

a.   **Notices.**  Any notices or other communications required or permitted by this Agreement shall be in writing and shall be considered delivered when given in the following manner to the addresses provided in the Management Services Agreement.  Notice may be given on behalf of a party by its counsel. Such communications shall be deemed to have been given (a) three (3) days after mailing, when mailed by registered or certified postage-paid mail, (b) on the next business day, when delivered by a same-day or overnight national courier

B-6

service or the U.S. Post Office Express Mail or (c) upon the date of receipt by the addressees when delivered personally or by facsimile. Any notice of change of address shall be effective only upon receipt of such notice.

b. **Entire Agreement; Amendment.** This writing constitutes the entire and only agreement of the parties with respect to the HIPAA Privacy and Security Standards and supersedes and cancels any and all prior negotiations, understandings and agreements concerning such HIPAA Privacy and Security Standards. This Agreement may be amended, modified, superseded, canceled, renewed or extended only by a written document signed by the parties.

c. **Waiver.** If any party fails to require performance or compliance of the duties and obligations of this Agreement, this failure shall not affect the party's right to require such performance or compliance at any time in the future. The waiver by any party of a breach of any provision of this Agreement is not a waiver of any earlier or future breach of such provision or as a waiver of the provision itself. No waiver of any kind shall be effective or binding unless it is in writing and is signed by the party against which such waiver will be enforced.

d. **Binding Nature; Assignment.** This Agreement shall be binding upon and inure to the benefit of each party, its successors and permitted assigns. Neither party may assign or otherwise transfer its rights or obligations under this Agreement, by operation of law or otherwise, without the prior written consent of the other party to this Agreement.

e. **No Third-Party Beneficiary.** Nothing expressed or implied in this Business Associate Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assignees of the parties, any rights, remedies, obligations, or liabilities whatsoever.

f. **Survival.** All rights, duties and obligations established in this Agreement shall survive termination of this Agreement.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

**MAGEE BENEVOLENT ASSOCIATION**

By:_____

Name:_____

Title:_____


**TRILOGY HEALTHCARE SOLUTIONS, INC.**

By:_____

Name:_____

Title:_____

B-8

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:   MAGEE BENEVOLENT ASSOCIATION D/B/A MGH          **CHAPTER 11**
           **Debtor**                                     **CASE NO. 18-03283-KMS**

# EXHIBIT "B"

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:   **MAGEE BENEVOLENT ASSOCIATION D/B/A MGH**          **CHAPTER 11**
         **Debtor**          **CASE NO. 18-03283-KMS**

### AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, the undersigned authority, in and for the

jurisdiction aforesaid, Bill Williams (the "Affiant") of Trilogy Healthcare Solutions, Inc. ("Trilogy"),

applicant for the roles of chief restructuring officer, chief financial officer and management services

professionals for the Debtor, who after having been by me first duly sworn, stated on oath that this

Affidavit is filed herein in support of the Application to Employ Chief Restructuring Officer, Chief

Financial Officer and Management Services Professionals (the "Application"), that Trilogy represents

no interest adverse to the Debtor or its estate in matters upon which it is to be engaged, and Trilogy's

employment as CRO/financial advisor/CFO/management consultant is in the best interest of the

estate. As a matter of disclosure, Trilogy is owed a substantial amount of fees for services rendered

to the Debtor prior to the filing of the Petition. Trilogy has agreed to waive, forego and release these

fees and expenses that are owed as of the date of the Petition. In addition, two shareholders of

Trilogy (including the putative CRO) also own a minority (combined 44%) interest in an entity

known as Trilogy Revenue Cycle Solutions, LLC ("Trilogy Revenue") which provides revenue cycle

management services to the Debtor pursuant to a separate agreement. It is the Debtor's current plan

to ask the Court for authority to assume the Trilogy Revenue agreement (which provides, in its

essence, that Trilogy Revenue is responsible for billing and collection functions for and on behalf

of the Debtor), at a later date. Debtor asserts that the relationship by, between and among the

Debtor, Trilogy and Trilogy Revenue, does not cause Trilogy to be a disinterested professional or

disinterested person. Trilogy has no connections with the creditors herein or any other party in

interest or their respective attorneys or accountants, or with the office of the U.S. Trustee, any employees thereof, which are prohibited, which would interfere with or hinder the performance of his duties herein, or which need to be described herein, other than as previously disclosed. As a result, Trilogy is a disinterested person as that term is contemplated within the Bankruptcy Code. The Affiant hereby makes application for the employment of Trilogy as chief restructuring officer, chief financial officer and management services professionals for the Debtor.

Bill Williams

STATE OF MISSISSIPPI
COUNTY OF Hinds

SWORN TO AND SUBSCRIBED BEFORE ME, this the 31st day of August, 2018.

NOTARY PUBLIC

-10-